22-316. And as I understand it, we have 20 minutes for the appellants and you'll figure out how to allocate that. Yes, Your Honor. May it please the court. Megan Hayes on behalf of Appellant Kevin Lewis and Ms. Hartfield and I are going to try to split our time as evenly as possible and I would, depending on the questions the court had, like to reserve three minutes of my 10 minutes for rebuttal, but I'm flexible on that. The issue I will be focusing on today is whether the government complied with the stringent statutory requirements for obtaining a wiretap order, and if not, whether the district court erred in failing to suppress all evidence derived from the first wiretap. Both Mr. Lewis and Mr. Pons maintain that the signature on the first wiretap authorization does not match that of the authorized individual it purports to represent. This is important because federal law requires a wiretap application to identify the specific person authorizing the application under oath or affirmation due to the extraordinary invasion of privacy that is made possible by electronic surveillance. What if there were no signature at all? Would you be satisfied at that point? It just stamped Brian Schwartz. No, because section 18 U.S.C. 2518 requires there to be, that the authorization be made under oath or affirmation and that, and I'm quoting from 1A of that section, that the identity of the officer authorizing the application be clear. I know there are a couple cases that the government has cited and also that the district court here cited, Terry, that indicates that a signature is not required, that a stamp is sufficient. First of all, those are not controlling. They're not binding on this 2518 that indicates that it has to be, that the authorization has to be made under oath or affirmation and that the identity of the responsible, mature, high-level DOJ official be clear on that authorization and that is because under both Giordano and Chavez, the Supreme Court has made it clear that Title III has very strict statutory requirements that the government has to adhere to in seeking authorization and an order to actually listen live onto people's telephone conversations because of the incredible invasion of press. Does the statute ever say explicitly that a signature is required? No, no, it doesn't, Your Honor, and fair point, but I do think the oath or affirmation language in 2518 makes clear that there has to be some affirmative signature. I know courts have said that a stamp signature is fine. At least you can identify the individual and perhaps at that point, were it to be challenged, the government could come forward with a declaration or some affidavit from a DOJ official as they have, as they did in every other case where a signature was challenged, the government came forward with evidence showing that that was in fact. But what if the signature, let's say this was a little different, the signature had perfect cursive handwriting and plainly said, quote-unquote, Bruce Schwartz, why should a court assume that the real Bruce Schwartz signed the authorization then? I'm sorry, I'm not sure. If it's a perfectly legible signature, I don't think there would be a... How do we know it was Bruce Schwartz? How do we know that someone else didn't sign it? Oh, fair enough. Right. There would have to be proof that it was a forgery. And there was, in fact, one case here where a pro se defendant asserted that it's a forgery and because there was no evidence that... But you're correct. There would have to be some additional showing that someone forged Bruce Schwartz's signature. Well, there's a signature here. Don't we have to presume in the first instance that it's his signature? Well, I believe, yes, there is a presumption that it is his signature, but the defendants rebutted that presumption at the hearing. With what? By raising the questionable signature, for example, the first letter, and I don't want to get into the weeds of it. Why couldn't it just as clearly be a signature from someone who has bad handwriting? Because it's our contention and it's been everybody's contention who's looked at this signature that's had problems with, had issues with reconciling it with Bruce Schwartz's signature. It's been reconciled in a number of other cases, and it's the same signature. Bruce Schwartz's signature has been reconciled in other cases? Yes. But in those cases, the government came forward with a declaration. They may have, but it looks, you know, if you look at those cases, they have the signature there. It looks pretty much the same signature. Why don't those other cases matter? I guess I haven't seen the other cases where the signatures have been provided. Well, how could they not have been, they had to have been provided if they were going to Bruce Schwartz's signature or someone else's signature. But when the government came forward with evidence that it was in fact the signature of Bruce Schwartz, it was actually an affidavit from the head of DOJ's Enforcement Division. The AUSA told the court that he emailed Mr. Schwartz and replied that the signature was his. Now, are you contending that the AUSA misrepresented to the court? I'm contending that's a possibility, yes. And if the AUSA wanted to meet its burden to prove that it had complied with the statutory requirements, that AUSA certainly could have gotten a declaration from Mr. Schwartz, could have produced the emails that the AUSA purported to have with Mr. Schwartz? Would those satisfy you? If there were a declaration and signed by Bruce Schwartz, you're in the same place, right? And an email, you'll say anyone can forge an email or type up an email. Well, I would hope, Judge Phelps, that an assistant U.S. attorney wouldn't forge an email. Wouldn't we hope a U.S. attorney wouldn't mislead the court? I understand, Your Honor, but I think the fact that the assistant U.S. attorney didn't come forward with something more makes that U.S. attorney, assistant U.S. attorneys colloquy with the judge even less credible because, as I've said, and I'm sure you'll see when you look at the cases, and perhaps you already have, in every other case the government came forward with something other than just the AUSA's word that this is in fact, I checked with the guy, this is in fact, he says this is his signature. Well, it's more than just checking with the guy. I mean, we have a, you say in your brief, or one of the briefs, there's no other evidence of authorization, but the memorandum that the government applied for authorization, it received an affirmative response, why isn't that at least some probativeness that it was a proper authorization? The letter that accompanied the authorization also had the same signature. I'm not talking about the signature, I'm talking about the content, that there are indicia of authorization in the fact that there was a request, there was a response to the request, there were statements about what was done in response to the request. Why isn't that, why doesn't that provide a basis for proper authorization? Because, your honor, and I'm going to finish answering your question and then I'm going to let my Ms. Hartfield take over with her time. Sorry, I don't want to gobble up her time. Because the statute requires the authorization to identify the specific individual, and that's in Giordano and Chavez as well. We need to know that a mature, responsible official at the highest levels of the Department of Justice has authorized. And it's been 50 years since those opinions, and granted at that time the DOJ needed some direction. Have there been problems with this? Well, perhaps not until this signature came up. But there have been other problems in the 90s, Judge Phillips, and that's where these other cases, O'Connell and Terry were. I guess I don't think the signature is as bad as you do. And as Judge Matheson says, there's all this indicia, including names and date received and content as far as I guess I'm still searching for what is your exact position? That DOJ went through all of this and Mr. Schwartz said, I'm busy, leave me alone. And so some underling scrawled something. Is that your position? That's correct. We don't know who signed this document. But he's presumed to have signed. He's presumed. He's authorized. His name is identified. He's presumed. Yes, but... I guess I'm failing to see how you rebutted that presumption by just challenging it. I'll let Ms. Hartfield answer the harder question. Thank you, Your Honor. I want to just clarify our position here, because you asked a question about what if we had a signature that was just Bruce Schwartz and we could tell who it was, there would not be any problem because the defense would have to come up with something as to why this might be a forgery. In this case, the difference here is we have a signature that is obviously not his. Why do you say that? I don't know if it is or not. I don't know him. But certainly the end of his signature on the second name ends in a Y or a Z. Just looking at that, the B, I've seen all kinds of variations of that. And so is there no source for a defendant to be able to see what Bruce Schwartz's signature looks like on other documents? So, you know, certainly the government could have brought that in. It would have been helpful if this were in fact Bruce Schwartz's signature. I think they would have brought that in. If you're that concerned that DOJ is manufacturing signatures, faking authorizations at risk of their careers, of course, and perhaps criminal prosecutions, that that's a fake signature, someone else wrote that name. Can't you find something that shows what his signature in fact looks like? I'd expect to see that for that kind of a payoff. Certainly the government had the opportunity to do that, and I think their response was telling. But if there's a presumption, why don't you just subpoena Mr. Schwartz? That, you know, certainly the government should have done that. No, no, you have to overcome the presumption. So the burden is then on you, isn't it? And well, we had the burden in production, and we brought in a signature that is clearly not Bruce Schwartz's. And I don't think it's enough to have one letter at the end of the name look like Bruce and the first letter is not a B. And there's no, I mean, we can argue about that. And if the court is going to entertain the possibility that that really is his signature, well, then I think we have, you know, I think we can go home. But the reality is there are three, you know, there are really three different kinds of signatures. There's some you can read, like mine. If you have that 28-J letter, it looks, you can tell exactly what it says. There's some you can't read at all, and you can't tell anything about it. And then there's some like this, where you can't tell exactly what it says, but you can tell what it doesn't say. And it doesn't say Bruce Schwartz. And that meets our burden in production. Well, what does it say then? Since you can tell what it says, what's the name? Again, this is a signature where you can not tell what it says, but you can tell whose signature it isn't. And you can tell it is not Bruce Schwartz's signature. That's our position. Your position is it's no one's signature, because you can't tell that it's any particular person's signature. Our position is that we can tell it's not Bruce Schwartz's. It's that third category. You can't tell whose it is, but you can tell whose it isn't. And that meets our burden of production. And at that point, the government could have come forward and given us something, some kind of assurance. They could have brought Bruce Schwartz in by video. They could have had him sign an affidavit. They could have even brought in these emails they supposedly sent. But they didn't. And they doubled down on a very implausible theory that even the district judge said was implausible. Well, how implausible was it that the AUSA called him and confirmed it was his signature? How implausible is that? Well, that's not what the AUSA said. He said he emailed him, and that he exchanged emails with him, and yet he didn't produce the emails. So I think the only way you can read this is that either Schwartz said, I screwed up. Just tell him it was my signature. Or the AUSA took it upon himself to make a misrepresentation of the court. I just don't see any other way you can read it other than those two ways. And I think the real difference here, in all the other cases that Bruce Schwartz may have been involved in, is that we have a signature that's clearly not his. And we have the government providing the court with no assurance that he actually approved it. Could the judge have taken judicial notice of what happened in the other cases and look at the signature that was submitted in those? The judge certainly could have done that if that were the case. Could this court do that? Our position would be that if you go back and you look at other cases, his signature is not going to look like that. Have you done that? We don't have access to these other cases. They'd be sealed. You know, the wiretap words are sealed. The only reason we got access to this was because... Well, the signature isn't sealed in your brief. Well, that's because we got it unsealed for, I believe we filed a motion to get that supplemental value. I'm just saying, if you've done your search in the other cases, I wonder if it's out there. I believe we searched, you know, I think both of us searched for other cases with his signature. It would be at the physical signature, and we did not find it. Judge Milgren, as far as I could see, never said this is implausible that that's his signature. He never said, I don't believe that's his signature. He never... He did what anybody would do and say, I don't necessarily see it there, but signatures are crazy all the time. And, you know, I mean, I don't recall anything, him saying anything, as you're representing here today, that this is implausible. He says the defense makes a fair point here. And what does that mean? That you can't, you do make a fair point. It's hard to read a signature. It's hard to see that it's this, but that doesn't overcome the presumption that this is a valid signature. I mean, all I can say is we're not saying the signature is hard to read. We're saying it's not his. And again, the reason we're saying that is because if you look at it and, you know, I've showed this signature to probably 50 people and I've asked them, does that look like Bruce Swartz? Not a single person said, yeah, that could be Bruce Swartz. So, I mean, I can't argue about it any more than that. That's not evidence in the record. I only say that's our position. It's not his? It's someone who doesn't have, who has indecipherable handwriting, but that doesn't mean it's not him. I'm not sure how many ways I can say this. There's a difference between indecipherable and being decipherable enough to see that something is not what it says. I understand your point, but you also said it's not his. How can you say that if it's indecipherable? Because it's not so indecipherable that you can't tell what it is. I mean, I guess an analogy would be if I'm standing here and I see a vehicle many, you know, down the block, I might be able to say I can't tell whether that's a Mercedes or a Hyundai, but I can tell you it's a car and I can tell you it's not a bike. And I think that's what we have here. I can't tell you exactly what that signature says, but I can tell you it doesn't say Bruce Schwartz. Can you tell us any of the letters in the signature? I would say the first letter looks like a J. And I would say the first letter of the second letter, it looks like something that has a, it looks like it could be a Z because it has a little check or it could be a T. Just so I'm clear, you're telling us in court today, not that this isn't legible and so therefore reverse or suppress, but instead, affirmatively, you're telling us this is not his signature. That is our position. And if it's not his signature, then there are misdoings. I think that's the only way to read it. And that's what you're saying. That's the only way to read it. I think the government's response is quite telling because again, the AUSA, when they got this motion, instead of getting some sort of a declaration, instead of bringing Bruce Schwartz in, instead of bringing in other documents he signed, they said, I just emailed him and he emailed back and said, he's offended that anybody would question that signature. He thought he signed it really nicely, but didn't produce the emails. So I think those two things together, unfortunately, I don't like to accuse the government of misconduct, but I just don't see any other way to read this. And it looks like I am out of time. Does the court have any other questions? Thank you, counsel. Good morning, Your Honors. James Brown for the United States. Your Honors, I'm going to stand on the brief on issue one, which is the speedy trial issue. Mr. Lewis has conceded that any error, if there was error, was harmless, and we're just going to go with that. We think that issue is no longer live, basically. We're also going to stand on the briefs on issue four, which is the sentencing issue. We think we've reached that adequately. I will address the authorization, the signature issue first, and then I'm not sure if the court wants me to talk about the I'm prepared to talk about that. But let's talk about the signature first. On the poll cam, since you have a lot of time, I'm not worried you're going to run out of time. Why was the district court upset about the poll cam? Did the government violate something leaving up the poll cam? Well, you know, it's hard for us to speak for the district court. The district court, I think, was just sort of at wit's end about how long it was taking to review the video. It took about 14 months to review 10,000 hours worth of video. I'm confused by that. Usually with a poll cam or jail calls or something, the government is the one spending the time and snipping pieces out that is going to be played to the jury. I don't understand why a defendant would need to watch every minute of the poll cam. Well, you know, it was part of the discovery, and they wanted to watch every minute. And so they got two paralegals to watch every minute, and it took them several months to do that. The snippets in the trial were 10 or 12 minutes, as I understand the record. And I assume, as with most poll cams, it's who was here, how long they were there, what they were carrying, and then they drove off. And so if you have 100,000 hours, nothing's going to undo that evidence that Joe Jones was there with a parcel under his arm and went in for two and a half minutes. So I'm confused by why that's even an issue. Well, you know, we share the court's confusion. We never really saw that this was such a humongous deal, other than the fact that it took a long time to review, and the court was very frustrated with the amount of time it took to review. And then, you know, you have several defendants who were saying the same thing. This is just a humongous burden on us to review the discovery. They shouldn't have left it running for so long. They left it running for 14 months. This is way too much for us. And the district court just sort of bought into their view and became very upset. Now, did we ever share the district court's view? We shared the frustration, but we never agreed that we did anything wrong, and we still don't think we did anything wrong. We investigated the case like we investigate cases. We have to be thorough. Poll cam footage, as the court knows, that poll cams can run for a long time. In this digital world, they can create a lot of footage. In this case, that's what happened. It's just part of the vast discovery in this case that had to be reviewed. You say you don't necessarily share the district court's view, but you certainly didn't object, did you, that the defense counsel was certainly entitled to review all 10,000 hours of this and you don't know what you're going to find on that. They had every right and reason to do so, and the court expressed frustration by how you had this 10,000 hours and eventually only a couple hours of it is usable. And so, I mean, a bit of it is in hindsight, but I don't think that, as the government, you could suggest that it wasn't necessary that all defense counsel have access and time to review all 10,000 hours. We're not arguing that they didn't have the right to review it. I mean, we gave them the discovery with the expectation that they would review it. So frustration is reasonable, I would think, part of the district court and defense. Well, we understand the frustration. That was what I told Judge Phillips. We understand the frustration. It takes a long time to review this, but we don't think that we did anything legally wrong by accumulating this much footage as part of an investigation based upon a reasonable investigative measure. I don't think anybody suggested he did do anything legally wrong. Well, I think that... I mean, it's a factor. I mean, it's been discussed in the speedy trial, but no one that I saw, including the trial judge, said there's a legal problem here and there's somehow barred. It was called inappropriate. And my colleagues on the other side called it reckless. The district court called it negligent because we left the camera running for too long.  That's sort of what I'm referring to. But that's really getting to the heart of it. I can see where you could leave it on too long to find incriminating things, where someone might get upset about that. But if it's 10,000 hours and you've got your 12 minutes and you want to watch the rest of it, it seems like the only reason you do that is for something exculpatory because you're not offering additional incriminatory. So maybe I got us off on the wrong track even raising that up. I remain confused. But it's not important. We share the court's confusion and we share the district court's frustration, but it's just part of an investigative measure. Poll cam footage exists. Poll cameras are used all the time. They create a lot of footage. People want to review them. That's their right to review them. We're fine with that. But we don't think we did anything negligent in accumulating that footage. Well, two to five minutes of your time, so you can move on. Got a lot of time this morning. I would just like, before I leave the poll cam footage, I would just like to highlight the district court's statement in the Keith case, which I think sort of governs this whole speedy trial issue, the constitutional speedy trial issue here. And the Keith case says, the delay is owing to the nature of large multi-defendant conspiracies with vast discovery are justified. This is a large multi-defendant conspiracy with vast discovery. Therefore, any delay is justified. We think that that statement, which was also echoed in the Jumia case, basically controls the speedy trial issue, at least on the length of the delay and the reason for delayed factors. So we think that this court should rely on that. We've relied on that. We think that that governs that issue with respect to the poll cam footage. Now, I will turn to the signature issue, unless the panel has any other questions about the poll cam footage. Okay, I see no questions. The signature issue, we start with the Radcliffe case. The Radcliffe case says, a wiretap authorization is presumed valid and the defendant has the burden of proof, not production, proof to show otherwise. This wiretap authorization was presumed valid whether the signature was legible or not. And they had the burden of proof to show that it was not valid. They offered no proof. Just saying we satisfy this burden of production does nothing. That's not proof. Producing something, producing the signature and saying, here's our production, that doesn't satisfy a burden of proof. That just puts something out there for consideration. It's not proof of anything. That burden was never satisfied here. Just saying the first letter looks like a J and not a B, and you can't tell what the first letter, the last name is, it doesn't look like an S, that is not proof. That is not evidence of anything. That is just speculation. It's just conjecture. It's just layperson suspicion. And it's saying that the signatures don't look like they match is not an argument that the signature is not genuine. As Judge Matheson pointed out in his colloquy with my colleagues on the other side, that they don't have a genuine signature by which to compare Mr. Swartz's B or his S to say that that B and the S that appears in the government's exhibit is not genuine. They don't have a genuine exhibit. So just by saying the B looks like a J, that does not impugn the genuineness or the authenticity of the signature. It's just making a statement that it's not readily legible. And to the extent that they're saying that the government is perpetrating one big lie upon them and upon the court, that's a humongous claim for which there is absolutely zero evidence. There's zero evidence of that. There's certainly no proof of that. And just saying the signature doesn't look like that looks like a J and not a B to me, that is not evidence. That's nothing. So they have not carried their burden of proof. Therefore, this court can just rely on the presumption that the authorization is valid to affirm. Another point that this court has also made, Judge Matheson made it during his colloquy with my colleagues, is that people scribble their names all the time. And when people, as this court knows, and I'm sure some people, scribble their names. But when people are scribbling their names, they're not trying to actually form letters. They're not trying to form readable letters. They're not trying to get points for appendixship. They're just signing their name quickly in sort of a messy way that's not readable. And sometimes that's how they've always signed their name. And just because somebody signs their name in a manner in which the letters do not appear to conform to the letters as we interpret them in the alphabet, that's not an attack on the genuineness of that signature. The only way to attack the genuineness of the signature is to give samples of a genuine signature and compare this signature to those. They didn't do that. They say it was our burden, but really it was their burden. They have the burden of proof. That's what Radcliffe said. That's what this court says. They could have subpoenaed Mr. Schwartz to come to the hearing. Could have done that. They didn't do that. Could have called him on the phone, asked him to give a signature. They didn't do that. They could have emailed him. They didn't do that. Aren't there samples of his signature out there that are publicly accessible? I don't. I wasn't able to find them, but that doesn't mean that they aren't out there. But they could have asked him to produce samples of his signature on prior pleadings. They could have asked him to produce samples of his signature on a piece of paper. They could have sat him down to a deposition and say, write your signature 25 times so we can compare this signature to your signature as you write it. That's how we used to do forgery cases in state court. But we didn't have the burden of proof. We didn't have to prove anything. That's presumed valid. We presumed it to be valid. But for added measure, we said, hey, we contacted Mr. Schwartz. He said it's his signature. We wanted to give the court that assurance. Well, it sounds like the debate this morning is Mr. Lewis, Mr. Ponser saying, well, you should have done more. And on the other hand, you're saying that they should have done more. And so does it really come down to who has the burden once this issue has been raised? Well, does it turn on the burden of proof? Yes or no. Yes, if this court says that we have to be satisfied that the signature is genuine for us to find that that authorization is valid, well, then yes, it turns on the burden of proof. Because in that event, they have not offered any proof whatsoever. So there is no proof. So it's still presumed to be valid. If this court says, we don't even need a signature to find an authorization, then it doesn't turn on the burden of proof. Because in that event, we produced a letter with substantial edition of authorization that specifies the identity of the person authorizing it. And it complies with the statutory requirements. So in that respect, it does not turn on the burden of proof. So that's the answer to the court's question, as we see it. I don't know that I really need to discuss any more about the signature unless the court has any more questions. If the court doesn't, I could turn to the prejudice issue on the constitutional speed trial claim. OK. We think the constitutional speed trial claim is weak, not only because of length of delay and the reason for delay, but also because the defendants have not shown any definite and non-speculative prejudice. This court's case law says that in order to sustain a prejudice claim for a constitutional speed trial, and this court knows that if they can't show any prejudice, they just can't win, even if they win on the other factors. That's going to be dispositive in almost all the cases. But they have to show definite and not speculative prejudice, and they have to show that the prejudice arises from the delay itself. I think that's the Margon case. Well, here, there's no definite and non-speculative prejudice claim. Mr. Lewis just says, well, witnesses' memories were not able to be, witnesses lost their memories, and it's just a hazy claim of prejudice. There's no specifics there. It's not a definite and non-speculative claim of prejudice. And then Mr. Pons' claim is that, well, if it hadn't gone on so long, then he had, Mr. Pons had, in effect, a counsel, and he could have gotten new counsel, and maybe that new counsel could have, might have been able to get him a better deal and make new arguments. That's a speculative claim of prejudice. It's not definite and non-speculative. And that's why both of their prejudice claims basically fail. And for that reason, almost alone, that's going to be extremely preponderant in the speed trial analysis. So we think that their claim of prejudice, the fact that they cannot show definite and non-speculative prejudice, basically dooms their constitutional speed trial. I see that my time is up. If the panel doesn't have any more questions, I will withdraw and ask the court to adjourn. I just had a question about the Barker factors, and one of the arguments that was made, I think it's on the fourth factor, and the pretrial incarceration. What is the government's position on the COVID argument that that would be relevant in considering the factor? There was COVID in the county jail. Well, you know, we compare that to basically, you know, just basic pretrial detainment. Granted, in this case, there was COVID going around in the jails. In every prison in America, people were getting COVID. And, you know, that was obviously a problem. And I think the jails did the best they could to deal with that. But it's a pandemic, and most people didn't have any control over it. But the court basically gave no weight to that factor, calling it an equivocal claim, because their periods of confinement in the county jails were not that lengthy. And that's what the district court found, and they don't rebut that finding. So that's, you know, that's what we say. It's just part of being a pretrial detainment that is not something that is unique to pretrial detainment when there's a pandemic going on. Okay, I see my time is up. Please affirm. Thank you. Thank you, counsel. Is there any time left? I think we're out of time, unfortunately. Do we have any other questions for the counsel? All right. In that case, the case will be submitted, and counsel are excused. Thank you all for your arguments this morning. And we'll take a short break. Thank you.